**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ASCOT CORPORATE NAME LIMITED and | ) | |
| LIBERTY CORPORATE CAPITAL LIMITED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO._____ |
| | ) | |
| MUNICH REINSURANCE AMERICA, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**ASCOT CORPORATE NAME LIMITED'S AND LIBERTY CORPORATE CAPITAL LIMITED'S COMPLAINT FOR A DECLARATORY JUDGMENT AND OTHER RELIEF AGAINST MUNICH REINSURANCE AMERICA, INC.**

Now come Plaintiffs, ASCOT CORPORATE NAME LIMITED ("ACNL") and LIBERTY CORPORATE CAPITAL LIMITED ("LCCL") (collectively ACNL and LCCL are "Plaintiffs"), by and through their attorneys, WALKER WILCOX MATOUSEK LLP, and for their complaint for a declaratory judgment and other relief against MUNICH REINSURANCE AMERICA, INC. ("Defendant") respectfully state as follows:

**INTRODUCTION**

1.      This is a reinsurance coverage dispute in which Plaintiffs seek a declaratory judgment and other relief pursuant to 28 U.S.C. §§ 2201 and 2202. Defendant executed a reinsurance placing slip ("Reinsurance Agreement") and issued a certificate of facultative reinsurance pursuant to which it agreed to reinsure Plaintiffs for certain losses incurred under a property insurance policy issued to Nations Asset Management, LP ("NAM") pursuant to Policy No. 901BL0902694 ("Underlying Policy"). Copies of the Reinsurance Agreement, facultative certificate and Underlying Policy are attached hereto as Exhibits A, B and C respectively.

1

2.      Pursuant to the terms of the Reinsurance Agreement, Defendant agreed to reinsure Plaintiffs for losses incurred on the Underlying Policy of up to $2,000,000 per occurrence after exhaustion of an $8,000,000 aggregate retention ("Reinsurance Retention") as a result of payment of claims by Plaintiffs on the Underlying Policy.

3.      During the effective period of the Underlying Policy, NAM incurred numerous claims that collectively exceeded the $8,000,000 Reinsurance Retention by a substantial amount. Plaintiffs' payment of these claims exhausted the Reinsurance Retention and triggered Defendant's reinsurance obligations.

4.      Accordingly, Plaintiffs submitted documentation to Defendant in a series of submissions dated August 6, 2009 to March 10, 2010 requesting payment under the Reinsurance Agreement.   The series of submissions from August 6, 2009 to March 10, 2010 constituted Plaintiffs' first reinsurance claim.   On March 23, 2010, in recognition of its obligations, Defendant settled Plaintiffs' first reinsurance claim for an amount in excess of $685,000.

5.      Thereafter, when Plaintiffs submitted documentation of additional claims paid under the Underlying Policy triggering further reinsurance obligations, Defendant inexplicably refused to pay.  Defendant now takes the untenable position that, contrary to the plain language of the Reinsurance Agreement, coverage is not triggered because the Reinsurance Retention was not exhausted.   Defendant now claims the Reinsurance Retention is only eroded by individual losses of at least $2,000,000 per occurrence.

## PARTIES

6.      Defendant is a corporation engaged in the business of insurance and reinsurance. Defendant is incorporated under the laws of Delaware and maintains its principal place of

business in Princeton, New Jersey.  For purposes of diversity of citizenship, Defendant is a citizen of Delaware and New Jersey

7.      Plaintiffs consist of two insurance syndicates engaged in the business of insurance in the insurance market commonly referred to as Lloyd's of London.  Lloyd's of London is not an insurance company and does not underwrite or issue insurance policies; rather, Lloyd's of London is a self-regulating entity which operates and controls an insurance market.  The Lloyd's entity provides a market for the buying and selling of insurance risk among its members.

8.      The members or investors who operate in the Lloyd's marketplace are called "Names."  The Names consist of individuals and corporations who finance the insurance market and ultimately insure risks.  Most "Names," or capital contributors ("Capital Contributors"), do not actively participate in the insurance market on a day-to-day basis.  Rather, the business of insuring risk at Lloyd's is carried on by groups of Capital Contributors called "Syndicates."  In order to increase the efficiency of underwriting risks, a group of Capital Contributors will, for a given operating year ("Year of Account"), form a "Syndicate" which will in turn subscribe to policies on behalf of all of the Capital Contributors in the Syndicate. The Syndicates themselves have no independent legal identity and, as such, a Syndicate bears no liability for the risk under a Lloyd's policy.  Rather, all liability is born by the individual Capital Contributors who belong to the various Syndicates that have subscribed to a policy.

9.      Each Syndicate appoints a managing agent who is responsible for the underwriting and management of each Capital Contributor's investment. The managing agent receives this authority through contracts with each Capital Contributor. The managing agent, which is typically a legal entity, appoints one of its employees to serve as the "active" underwriter for the Syndicate.   The active underwriter selects the risks that the Capital

Contributor(s) in the Syndicate will underwrite and has the authority to bind all Capital Contributors in the Syndicate.  The active underwriter has the authority to buy and sell insurance risks on behalf of all Capital Contributors in the Syndicate, and to bind the Syndicate members in these transactions.

10.     Plaintiff ACNL was the only Capital Contributor to Syndicate 1414 during the relevant 2009 Year of Account.  In that capacity, ACNL subscribed to 50% of the risk under the Underlying Policy through its managing agent, Ascot Underwriting Limited ("Ascot").  ACNL, through Ascot, ceded a portion of that risk, as described below, to Defendant pursuant to the Reinsurance Agreement.  ACNL is a corporation organized under the laws of the United Kingdom with its principal place of business in London, England.  For purposes of diversity of citizenship, ACNL is a citizen of the United Kingdom.

11.     Plaintiff LCCL was the only Capital Contributor to Syndicate 4472 during the relevant 2009 Year of Account.  In that capacity, LCCL subscribed to 50% of the risk under the Underlying Policy through its managing agent, Liberty Syndicates ("Liberty").  LCCL, through Liberty, ceded a portion of that risk, as described below, to Defendant pursuant to the Reinsurance Agreement.  LCCL is a corporation organized under the laws of the United Kingdom with its principal place of business in London, England.  For purposes of diversity of citizenship, LCCL is a citizen of the United Kingdom.

## JURISDICTION AND VENUE

12.     This Court has subject matter over this dispute pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000, exclusive of interest or cost, and the controversy is between a citizen of Delaware and New Jersey and citizens or subjects of the United Kingdom.

4

13.     This Court has general jurisdiction over the Defendant because Defendant has systematically and continuously done business in Texas under the Texas Department of Insurance License Number 93407 and, accordingly, has sufficient minimum contacts with Texas so as to satisfy the requirements of due process.

14.     This Court also has specific jurisdiction over Defendant because this dispute arises out of a contract of facultative reinsurance to which Defendant is a signatory, and which reinsures Plaintiffs with respect to risks insured by the Underlying Policy issued to NAM, a Texas limited partnership and which insures/reinsures property located in Texas.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.  Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(a)(3) because the Defendant is subject to personal jurisdiction in this judicial district.

## BACKGROUND

### A.     The Underlying Policy

16.     The Underlying Policy was issued to NAM, a purchasing cooperative operated by an insurance broker, Southwest Risk, LP.  The members of NAM's cooperative were owners of habitational properties in Texas and elsewhere, such as apartment and condominium buildings, and who secured property insurance through the Underlying Policy.  As the owners of multi-unit residential properties, NAM's members historically suffered a high volume of relatively small property damage losses.

17.     Ascot, as managing agent of Syndicate 1414, and Liberty, as managing agent of syndicate 4472, agreed to subscribe to the Underlying Policy. Once facultative reinsurance was

secured from Defendant, Ascot and Liberty, on behalf of ACNL and LCCL respectively, each

subscribed to 50% of the Underlying Policy

18.     The Underlying Policy, which was in effect from April 1, 2009 to April 1, 2010,

contained the following endorsement:

## POLICYHOLDER'S SELF-INSURED RETENTION
### [Endorsement 33]

It is hereby agreed that the Policyholder will retain a total of 6,000,000 in the
aggregate in respect of all Occurrences during the Period of Insurance, after
application of the applicable Deductibles, but the Policyholder will not retain
more than 2,000,000 per Occurrence after application of the applicable
Deductibles.

Provided always that the total amount retained by the Policyholder in respect of
all Occurrences during the Period of Insurance will not exceed 6,000,000 in the
aggregate, after application of the applicable Deductibles.

19.     Pursuant to the foregoing endorsement, NAM agreed to a self-insured retention

("SIR") with a $2,000,000 per occurrence limit and a $6,000,000 aggregate limit.  Importantly,

the Underlying Policy imposed no limitation on the types or minimum amount of claims that

eroded the $6,000,000 SIR.

20.     The Underlying Policy further provided that Plaintiffs were obligated to pay up to

$2,000,000 per occurrence and in the aggregate upon the exhaustion of NAM's SIR:

### Policy Limit of Liability
### [Endorsement 34]

The Policy Limit of Liability is restated as follows:

2,000,000 per Occurrence, but

2,000,000 per Occurrence and in the aggregate in the Period of Insurance in
respect of the peril of Earth Movement…and in respect of the peril of Flood….

### B.       The Reinsurance Agreement

21.   The Reinsurance Agreement, which was in effect from April 1, 2009 to April 1, 2010, contained the following relevant provisions:

**Sum
Reinsured:**       To pay the difference between

USD 2,000,000 any one occurrence Combined Single Limit in respect of Property Damage / Time Element.

And

USD 2,000,000 any one occurrence Combined Single Limit in respect of Property Damage / Time Element, but USD 8,000,000 <u>in the aggregate</u> for the period. (emphasis added)

Which in turn to pay excess of Original Deductibles and limited by sublimits as may be more fully defined in the Original Policy Wording.

\*              \*              \*

**Conditions:**   This reinsurance is subject to the same terms, clauses conditions and amendments as original (excluding Premium and Sum Reinsured) and follows the settlements of Original Underwriters in all respects.

**Choice of
Law &
Jurisdiction:**   Any disputes arising from or in connection with this reinsurance shall be governed by the Law of Texas and the jurisdiction of the court of selected jurisdiction as determined by the Service of Suit Clause NMA1998.

22.   Defendant charged $2,279,600 in premium for the reinsurance coverage, which was paid in full by Plaintiffs.

23.   In securing Defendant's agreement to issue facultative reinsurance to Plaintiffs for the Underlying Policy, the London broker put together a reinsurance submission to Defendant, which included NAM's loss history.  A copy of the loss history is attached hereto as Exhibit D. The loss history showed that NAM historically suffered a large volume of relatively modest

losses.  Thus, it was anticipated by Plaintiffs when the Underlying Policy was issued that the losses collectively would not exceed the $6,000,000 SIR.

24.    The London broker's reinsurance submission was reviewed by Manhattan Underwriting Association ("MUA"), an underwriting agency.  On March 30, 2009, MUA sent a letter to the London broker which stated, on behalf of Defendant:

> We are willing to authorize 100% of a layer $2,000,000 per occurrence after exhaustion of $2,000,000 per occurrence **but $8,000,000 in the aggregate** for the captioned account…
> (Emphasis added.)

A copy of the letter dated March 30, 2009 is attached hereto as Exhibit E.

25.    The March 30, 2009 letter contained a series of hypotheticals that demonstrated how MUA understood the reinsurance coverage would respond.  The hypotheticals were intended to demonstrate that the maximum amount any one loss could erode the Reinsurance Retention was $2,000,000 per occurrence.

26.    Subsequent to Defendant's execution of the Reinsurance Agreement, the parties incorporated the hypothetical loss scenarios directly into the Reinsurance Agreement by Endorsement No. 3:

> *MUNICH RE AMERICA COVERAGE FOR LAYER IS A 5TH EVENT COVERAGE*
> *Example:*

| *LOSS DATE/ AMOUNT* | *Primary – AGM 2488* | *Munich Share* | *Excess* |
|---|---|---|---|
| *3/13/08-3,000,000* | *2,000,000* | *0* | *1,000,000* |
| *4/25/08-4,000,000* | *2,000,000* | *0* | *2,000,000* |
| *7/01/08-3,000,000* | *2,000,000* | *0* | *1,000,000* |
| *8/15/08-5,000,000* | *2,000,000* | *0* | *3,000,000* |
| *09.01/08-3,000,000* | *0* | *2,000,000* | *1,000,000* |

> *Please note the above is based on single loss events, however it can be multiple events that add up to 2,000,000 per occurrences with an 8,000,000 aggregate before our participation takes place.  (**The __maximum__ charged against the aggregate as a result of any one occurrence or loss event is $2,000,000**.)*

8

(Emphasis added). A copy of Endorsement No. 3 is attached hereto as Exhibit F.

27.     Under the terms of the Reinsurance Agreement, the parties agreed that Texas law applies to interpretation any dispute over coverage.

### C.     The Losses.

28.     Both the Underlying Policy and the Reinsurance Agreement incepted on April 1, 2009.  Approximately three months later, Plaintiffs noticed a substantial increase in claims activity for the Underlying Policy than what was anticipated given NAM's prior loss history. The frequency and severity of the losses were greater than Plaintiffs had anticipated when the Underlying Policy was issued.

29.     On August 6, 2009 Plaintiffs sent Defendant the first in a series of formal claims advices. On September 2, 2009, in response to an e-mail from MUA noting that Defendant "will want the full detail of the losses that eroded the aggregate," Ascot forwarded to MUA documentation that showed the Reinsurance Retention was being eroded by claims of less than $2,000,000 per occurrence.  In total, six claims advices were forwarded to Defendant between August 6, 2009 and March 19, 2010.

30.     The dates and amounts of the claims advices sent to Defendant between August 6, 2009 and March 19, 2010 are as follows:

| Date | O/S To Layer US$ | Incurred to Layer US$ |
|---|---|---|
| 8/6/09/09 | 4,215,301 | 4,215,301 |
| 11/05/09 | 6,285,563 | 6,285,563 |
| 12/03/09 | 7,087,538 | 7,087,538 |
| 01/20/10 | 11,167,132 | 11,167,132 |
| 02/09/10 | 12,493,058 | 13,178,322 |
| 03/19/10 | 9,937,248 | 14,513,804 |

31.     Despite receiving the foregoing claims advices together with itemized documentation, Defendant never raised any objection or suggested that the erosion of the Reinsurance Retention by claims of less than $2,000,000 per occurrence was, in any way, inconsistent with terms of the Reinsurance Agreement.

32.     To the contrary, on March 23, 2010 Defendant settled Plaintiffs' first reinsurance billing for an amount in excess $685,000.   This billing was accompanied by 42 pages of documentation showing that the Reinsurance Retention had been exhausted by numerous claims of less than $2,000,000 per occurrence.   Defendant's settlement of Plaintiffs' first reinsurance claim unambiguously demonstrates that Defendant fully understood that the Reinsurance Retention had been exhausted and its reinsurance obligation triggered.

### D.     The Reinsurance Dispute

33.     When Plaintiffs submitted their second reinsurance billing,  Defendant, for the first time, raised an issue with respect to the reinsurance coverage.   In a letter dated April 1, 2010, Defendant, without reference to any language of the Reinsurance Agreement, erroneously asserted:

> It was always our underwriting intent to provide a fifth event and subsequent cover going back the (sic) initial underwriting submission.  In other words, there would have to be four events in excess of $2,000,000 each before our cover was impacted.

A copy of the April 1, 2010 letter is attached hereto as Exhibit G.

34.     Defendant's position, as set forth in its April 1, 2010 letter, is blatantly contrary to the Reinsurance Agreement, which contains no limitation on the amount of the individual losses that erode the Reinsurance Retention.    There is no requirement that the individual losses must exceed $2,000,000 in order for the Reinsurance Retention to be eroded or that  there must be four

individual losses or events each exceeding $2,000,000 in order for the Reinsurance Retention to be eroded.

35.    Defendant now wrongfully claims that the $685,000 paid to Plaintiffs for the first billing must be reimbursed.

36.    In a letter dated July 2, 2010, Defendant once again wrongly asserted that the Reinsurance Agreement only responds in the unlikely event NAM suffered five losses of at least $2,000,000 per occurrence.  The July 2, 2010 letter stated:

> As we have stated, it was always our underwriting intent to provide a fifth event and subsequent coverage, going back to, and based on, the initial JLT submission. In other words, there has to be four events in excess of $2,000,000 each before our cover was impacted.  We specifically provided an example of how our layer participation works.

A copy of the July 2, 2010 letter is attached hereto as Exhibit H.

37.    Defendant's construction of the Reinsurance Agreement is: (1) contrary to the plain and unambiguous language of the Reinsurance Agreement; (2) contrary to the Reinsurance Agreement's follow the settlements clause; and (3) renders the reinsurance coverage illusory.

## CAUSES OF ACTION

### Count I
### (Declaratory Judgment – Reinsurance Triggered)

38.    Plaintiffs incorporate and reallege the allegations of paragraphs 1 to 37 as if fully set forth herein.

39.    Defendant's position is that the Reinsurance Agreement only responds to a fifth loss under the Underlying Policy of at least $2,000,000.  Further, Defendant contends that because the Underlying Policy has not incurred a fifth loss of at least $2,000,000, the Reinsurance Retention has not been exhausted and its reinsurance coverage is not triggered.

11

40.     The plain and unambiguous language of the Reinsurance Agreement provides that all losses to the Underlying Policy erode the Reinsurance Retention regardless of the amount. Further, Plaintiffs have paid claims under the Underlying Policy in excess of the $8,000,000 Reinsurance Retention.   Thus, Defendant's reinsurance obligation has been triggered and Defendant must pay Plaintiffs' second and subsequent reinsurance billings.

41.     Plaintiffs have no adequate remedy at law and, therefore, are entitled to a declaratory judgment.

42.     A justiciable controversy exists under 28 U.S.C. §§ 2201 and 2202 as to the parties' interpretation of the Reinsurance Agreement.

WHEREFORE, Plaintiffs respectfully request that the Court enter a judgment declaring that:

A.     The Reinsurance Retention is eroded by all claims incurred under the Underlying Policy, including claims of less than $2,000,000 per occurrence;

B.     The $8,000,000 Reinsurance Retention has been fully exhausted by payment of claims incurred under the Underlying Policy;

C.     Defendant is obligated to pay Plaintiffs for all past and future reinsurance billings under the terms of the Reinsurance Agreement, including allocated loss expenses;

D.     Plaintiffs are not obligated to reimburse Defendant for the $685,000 paid in connection with the first reinsurance billing;

E.     Plaintiffs are entitled to pre–judgment interest commencing from the date the unpaid reinsurance billings were submitted; and,

F.     Plaintiffs are entitled to an award of attorneys' fees and costs and other such relief as the Court deems just.

## Count II
### (Breach of Contract)

43.     Plaintiffs incorporate and reallege paragraphs 1-37 as if fully set forth herein.

44.     Plaintiffs paid $2,279,600 to Defendant, which was the full amount of the premium owed under the Reinsurance Agreement and have in all other respects satisfied their obligations under the Reinsurance Agreement.   The Reinsurance Agreement is a valid and binding agreement as between Plaintiffs and Defendant.

45.     Defendant has breached the Reinsurance Agreement by refusing to pay Plaintiffs' second and subsequent reinsurance billings despite the fact that Defendant's reinsurance obligations have been triggered

46.     The Reinsurance Agreement's "Follow the Settlements" requires the Defendant to "follow the settlements of the Original Underwriters in all respects."  Plaintiffs paid sums owed NAM in accordance with the Underlying Policy and Defendant's refusal to reimburse the Plaintiffs constitutes a breach of this provision.

47.     Defendant's unsupportable interpretation of how the Reinsurance Retention exhausts renders the reinsurance protection purchased by Plaintiffs illusory.  The nature and amount of losses under the Underlying Policy, of which Defendant was aware when it accepted premium for the Reinsurance Agreement, and for which it has already made one payment, makes it virtually impossible for four losses to exceed $2,000,000 each.

48.     As a result of Defendant's breaches of the Reinsurance Agreement, Plaintiffs' have suffered actual and consequential damages in an amount substantially in excess of $11,000,000.

WHEREFORE,   Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant awarding actual and consequential damages in an amount to be proven at trial for Defendants' breaches of the Reinsurance Agreement in addition to attorneys' fees and costs and any additional damages the Court deems justified.

## Count III
### (Unfair Insurance Practices -- § 541 of the Texas Insurance Code)

49.     Plaintiffs incorporate and reallege paragraphs 1-37 as if fully set forth herein.

50.     Section 541.060 of the Texas Insurance Code makes it an unfair insurance practice to engage in unfair settlement practices such as: failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear.

51.     Defendant qualifies as a "person" within the meaning of § 541 of the Insurance Code.  Further, Defendant has committed an unfair insurance practice by "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of" Plaintiffs' reinsurance claims, despite the fact that Defendant's liability under the Reinsurance Agreement is reasonably clear. Plaintiffs' have been harmed by Defendant's unfair conduct in that: (1) they have been deprived of a rather substantial reinsurance recovery; (2) they have been compelled to carry substantial accounts receivable for more than 90 days, causing Plaintiffs to sustain reputational damage with Lloyd's because such an aged debt negatively affects Plaintiffs' debt management statistic.

52.     On March 23, 2010 Defendant settled Plaintiffs' first reinsurance billing in an amount exceeding $685,000. Defendant's settlement of Plaintiffs' first reinsurance claim unambiguously demonstrates that Defendant knew that the Reinsurance Retention had been exhausted and its reinsurance obligation triggered.  Further, Defendant's refusal to meet with Plaintiffs in the presence of Defendant's underwriters strongly suggests Defendant knows that its refusal to pay Plaintiffs' claims is wrongful.  Thus, Defendant's conduct is knowing and Plaintiffs are entitled to treble damages under the Texas Insurance Code.

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in their favor and against Defendant awarding Plaintiffs three times the actual damages Plaintiffs have incurred

14

together with reasonable costs and attorneys' fees for Defendant's unfair insurance practices under § 541 of the Code.

<u>**CONCLUSION**</u>

For the reasons set for hereinabove, the Court should enter judgment in favor of ASCOT CORPORATE NAME LIMITED and LIBERTY CORPORATE CAPITAL LIMITED and against MUNICH REINURANCE AMERICA, INC.

Dated:  September 24, 2010

ASCOT CORPORATE NAME LIMITED and
LIBERTY CORPORATE CAPITAL LIMITED


By: /s/ *Kristine M. Sorenson* _____
        One of their attorneys


WALKER WILCOX MATOUSEK LLP
Kristine M. Sorenson
State Bar No.:  24072446
Federal Bar No.:  1044078
Charles B. Walther
State Bar No.:  24005125
Federal Bar No.:  30775
711 Louisiana Street
Suite 3100
Houston, Texas   77002
Tel: 713-654-8001
Fax: 713-654-8818